IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA

CASE NO: 8:19-Cr-388-T-35AEP

THE UNITED STATES OF AMERICA,

    Plaintiff,

v.

NELSON ALFARO

    Defendants

_____/

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant, Nelson Alfaro, files his sentencing memorandum. In support, Mr. Alfaro states:

## INTRODUCTION

The Court has a copy of Mr. Alfaro's Objections to the Presentence Investigation Report (PSI), which is attached to the Final PSI and which was filed on today's date, March 9, 2020.  This Sentencing Memorandum has two sections: I. A memorandum which responds to the PSI's new argument in support of one of the guideline enhancements to which the defendant objected; and II. A memorandum addressing the section 3553(a) factors. The government will be filing motion pursuant to section 5K1.1 of the Guidelines. Apart from addressing the fact that Mr. Alfaro cooperated, this memorandum does not detail Mr. Alfaro's cooperation. We will address the

1

government's motion *and* the details of Mr. Alfaro's cooperation in a separate memorandum filed in response to the government's motion after it files the motion.

## I.      OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

Mr. Alfaro objected to two of the three enhancements found in found in paragraphs 57 and 58, respectively. In the initial PSI, it was paragraphs 56 and 57, respectively. This memorandum responds to the PSI's new theory and argument in support of the enhancement set forth in paragraphs 46 and 57 of the Final PSI, which argue that Mr. Alfaro's offense conduct resulted in substantial interference with the administration of justice pursuant to USSG § 2J2(b)(2).

### OBJECTION TO PARAGAPH  57 – SUBSTANTIAL INTEFERENCE

### Reply to the PSI's New Argument and Basis for the Enhancement

After confronting Mr. Alfaro's objections and conceding that the rational for the enhancement cited in the initial PSI fails to support application the substantial interference guideline, Probation (and the government) nevertheless now advances a new argument that is nowhere to be found in the initial PSI, namely that the substantial interference enhancement applies because the investigation of Mr. Alfaro's offense led to the government expending substantial resources into investigating Mr. Alfaro's past or other cases to see whether he had engaged  in similar Rule 35 fraud in those other cases. *See* Final PSI, ¶ 46. The Court should reject this argument.

Firstly, the only evidence of any investigation or consideration of any of Mr. Alfaro's other or past cases that the government provided as discovery in this case is found in the FBI 302 reports of Mr. Alfaro's debriefings about his relationship with a

2

person against whom he cooperated (*see* Final PSI, ¶ 125) and a list of his cases which he discussed with the government while protected with limited use immunity and which may *not* be used to calculate Mr. Alfaro's guidelines under USSG § 1B1.8. Hence, it appears that the PSI (and the government) are now using Mr. Alfaro's cooperation against him in violation of section 1B1.8, which specifies that the information which a cooperating defendant provides shall not be used in determining the defendant's applicable guideline range.

To the extent there were other investigations into Mr. Alfaro's past or other cases which the government undertook before he cooperated, the government failed to provide us any discovery or evidence about them and this is first that Mr. Alfaro has heard of it. Not a single report disclosed among the many reports provided with the government's discovery alludes to any substantial time and resources expended on re-interviewing witness and reinvestigating case information from Mr. Alfaro's past or other cases. The case list shown to Mr. Alfaro during his debriefing shows only which cases might still be open, their location and the name of the prosecutor. These purported other expenditures of resources are *nowhere* mentioned in the initial PSI and do not form any basis of the argument Probation made in support of the subject enhancement. *See* Initial PSI, ¶ 56 (arguing that the enhancement applies because Mr. Alfaro *intended* to influence the court and obtain a sentencing reduction for his client). Mr. Alfaro now faces the surprising new claim that the government spent substantial time and resources investigating matters other than what he was charged with and that which stems from what *he told* the government as a cooperator. It is simply unfair

3

for Mr. Alfaro to cooperate, review the indictment, review the government's discovery and evidence, review the PSI, find *nothing* about these substantial *other* investigations into his past or other cases, craft and file his objections to the PSI, *and then* face new evidence and arguments that were not raised until *after* his well-reasoned objections showed that the enhancement pursuant to section USSG § 2J21.2(b)(2) does not apply. For that reason alone, this Court should reject PSI's newfound argument.

Should the Court nevertheless be considering this newfound argument, there are additional reasons why the Court should reject it. To start, as of the writing of this memorandum, the government has failed to produce any evidence with which it may meet its burden of proving that it expended substantial resources on anything other than investigating Mr. Alfaro for the purpose of bringing the indictment against him and following up on the information *he provided* it as part of his cooperation. Importantly, any time and resources spent reviewing Mr. Alfaro's other or past cases do not constitute "[t]he *unnecessary* expenditure of substantial governmental or court resources." USSG § 2J21.2(b)(2), Application Note 1. (Emphasis added). Going back to look at Mr. Alfaro's other or past cases *before* he cooperated, which here, if true, did not disclose any false or fraudulent Rule 35 motions filed for any of Ms. Alfaro's clients, appears to be nothing more than the expenditure of resources to look for other offenses with which to charge him. They would have been necessary to investigating Mr. Alfaro and bringing the prosecution against him. *See* Defendant's Objections to the PSI, pages 4-5 (discussing cases that require that application of the guideline cannot be premised on expenses and resources incurred investigating and bringing the defendant to trial).

4

Had such a pre-cooperation inquiry revealed a falsely induced Rule 35 or section 5K1.1 motion, then we might agree that Mr. Alfaro substantially interfered with the administration of justice in those cases where such a falsely induced motion was filed. But, again, that is not what happened here. And to be clear, whether undertaken before or during Mr. Alfaro's cooperation, none of his other or past cases involved any fraudulently induced Rule 35 or section 5K1.1 motion filed for any of Mr. Alfaro's clients.

The PSI cites several cases to bolster its argument that the government's investigation of M. Alfaro's past or other cases support imposition of the enhancement. *See* Addendum to PSI (citing *United States v. Sinclair*, 109 F.3d 1527, 1540 (10th Cir.1997); *United States v. Atkin*, 29 F.3d 267, 268 (7th Cir.1994); *United States v. Leung*, 360 F.3d 62, 67–68 (2d Cir.2004); *United States v. Barnhart*, 889 F.2d at 1374, 1379–80 (5th Cir. 1989)). According to the PSI, the *Barnhart* Court held that a defendant's perjury before a grand jury resulted in the work of two officers for "two weeks trying to sort out the truth." A reading of these cases, which all involve a defendant's perjurious or obstructive conduct causing the expenditure of wasted resources in the actual cases that were impacted because of the defendant's conduct, show that they do not support imposition of the enhancement upon Mr. Alfaro.

In *United States v. Barnhat*, the defendant was prosecuted and sentenced for perjury for testifying to a grand jury investigating a fraud in the savings and loan industry. 889 F.3d at 1376. According to the Court, the enhancement was based on the fact that the defendant had interfered with the investigation and trial of the fraud, not

5

the "unnecessary expenditure of resources." *Id.* at 1380 Citing the defendant's presentence investigation report, the Fifth Circuit reasoned as follows:

> [B]ecause the defendant was uncooperative and provided less than truthful information to the grand jury, the FBI's investigation of the case in question was hindered as well as the investigation of the FSLIC representative who advised Barnhart to "get dumb."
>
> The district court also found substantial interference from the "evidence at trial." Although Barnhart is correct that there were no findings as to the "unnecessary expenditure of substantial government or court resources," which would be one method of establishing a factual basis for this increase, he has not made any showing that the district court's adopted findings *as to the hindering of the investigations* were clearly erroneous or that the court erred in applying this increase.

*Id.* at 1380. (Emphasis added). Unlike the defendant in *Barnhart* whose perjury, in fact, interfered with an ongoing grand jury investigation and then a trial, there is no case or proceeding which Mr. Alfaro's offense conduct impacted. And a close reading of the case shows that the enhancement was based on the finding that the defendant's conduct interfered with grand jury proceedings and trial rather than the "unnecessary expenditure of resources" cited in the PSI.

Similarly, in *United States v. Sinclair,* the defendant lied while testifying during a trial of two men charged with gun and drug offenses. 29 F.3d at 1529. The defendant's perjured testimony directly impacted the trial of the defendants because it served as the "cornerstone" of their defense and caused the government to recall witness and extended the trail. *Id.* 1539-40. Here, there was no trial or other

proceedings which were similarly impacted, making the *Sinclair* case entirely distinguishable from the facts in Mr. Alfaro's case.

*United States v. Atkins* and *United States v. Lueng* also fail to provide Probation and the government the support the PSI claims those cases do. The application of the guideline in *Atkins* was based on unnecessary resources the prosecutor claimed the government expended in a case in which, again, unlike here, the defendant lied to a grand jury investigating a drug trafficker. 29 F.3d at 268 -269 (explaining that the defendant had failed to challenge hearsay statements which the prosecutor made in support of the enhancement through cross-examination and testimony and therefore the sentencing court was free to rely on the prosecutor's narrative).

*Lueng* involved a defendant who faked his own death during the September 11th attack in New York and before trial, triggering the proverbial wild goose chase to verify whether he was in fact dead. 360 F.3d at 67. His was no ordinary bail jumping case. The court explained that the Marshals were forced to expend substantial unnecessary time and effort because the defendant faked his death:

> At the time of the December 2001 court conference, no one involved-including Leung's counsel-knew whether he was alive. To determine whether Leung had, in fact, survived the September 11th attacks, numerous Marshals had to spend significant time consulting with the Law Department, the Missing Persons Unit, and Cantor Fitzgerald as well as conducting interviews with family members, former employers, and others. Assuming, as Leung contends, that he stopped faking his death by the time he failed to appear in court, his contention overlooks the fact that the government had expended substantial time and resources in dealing with the consequences of his "death" since he took no steps to correct the misunderstanding he purposely created. We therefore find no error in the District

Court's conclusion that Leung's actions caused the unnecessary
expenditure of substantial government resources.

*Id.* at 67-68. Mr. Alfaro's offense conduct, by contrast, did not essentially derail the case

against him or anyone else and cause the government to waste substantial time and

resources chasing down his lies.

Next, any investigation into, or time spent on, Mr. Alfaro's past or other cases on

a hunch that they may be tainted by similar conduct to his offense conduct in this case

is too attenuated to serve as relevant conduct that can be used to increase his

guidelines. Indeed, the PSI merely claims that the government expended such

resources during the investigation of the offense conduct in this case, not that the

government had any evidence that Mr. Alfaro has falsely procured a Rule 35 or section

5K1.1 motion in another case. *See* Final *PSI, ¶46.* It is impossible to see how such an

investigation constitutes relevant conduct or may serve as the basis for the subject

enhancement, especially where the only evidence we know of that might touch on Mr.

Alfaro's past or other cases is protected by section 1B1.8. Nor did any such inquiry turn

up any wrongdoing that can possibly serve as relevant conduct pursuant to USSG §

1B1.3 (defining relevant conduct and providing that the base offense level, specific

offense characteristics and chapter 3 adjustments are to be determined based on the

defendant's relevant conduct as defined and limited in the guideline). In short, that the

government spent some time investigating Mr. Alfaro's past or other cases during the

investigation of the instant offense, which is a conspiracy in which it participated as

part of its undercover sting, did not substantially interference with the administration of justice.

## II.    SECTION 3553(a) FACTORS

### Preliminary Statement

*"Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results."[1]*

### Legal Standard

A sentence should be sufficient but not greater than necessary to comply with the specific purposes set forth in 18 U.S.C. § 3553(a)(2). *Gall v. United States*, 552 U.S. 38, 49-50 (2007). The Sentencing Guidelines are no longer mandatory and are not presumed to be reasonable. *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable") (emphasis in original); *Rita v. United States,* 551 U.S. 338, 351 (2007). Calculation of the advisory guideline sentence is only the first step in the sentencing process, and a court must consider whether the section 3553(a) factors support the requested sentence. *See Gall*, 552 U.S. at 49-50 (guidelines should be "starting point" and "initial benchmark"); *United States v. Hunt*, 459 F.3d at 1180 1184 (11th Cir. 2016) ("If *Booker* is to mean anything, it must be that district courts are

---

1 *United States v. Gupta,* 904 F. Supp.2d 349, 350 (S.D.N.Y.) aff'd 747 F.3d 111 (2nd. Cir. 2014).

obligated to impose a reasonable sentence, regardless of the guideline range, so long as the Guidelines have been considered").

Under *Gall*, the advisory guideline range is calculated first but does not have "any particular weight." *United States v. Irey*, 612 F.3d 1160, 1217 (11th Cir. 2010) (en banc). The Court must conduct an individual assessment of the defendant based on the §3553(a) factors and may "reject (after due consideration) the advice of the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 113 (2007). Indeed, the Court "may vary [from the Guidelines range] based solely on policy considerations, including disagreements with the Guidelines." *Id*. at 101 (quotations and citations omitted); *Gall*, 552 U.S. at 47 (court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range").

This Court should tailor the ultimate sentence it imposes on Nelson Alfaro in line with the factors set forth in 18 U.S.C. § 3553(a). Based on those factors, which are discussed below, Mr. Alfaro respectfully avers that a sentence without imprisonment is warranted.

## A.      The nature and circumstances of the offense.

To start, we recognize that the offenses at issue in this case, which involve a lawyer making false statements to the government and conspiring to obstruct justice, are serious offenses. Mr. Alfaro's conduct was deceitful.  We do not pretend otherwise. Nor does Mr. Alfaro have any good reason, justification, or excuse for having committed the offenses. He lost his way and he was wrong.

For better or worse our federal criminal justice system is built on a foundation of

10

cooperating witnesses and defendants looking to lessen their prison sentences. Mr. Alfaro attempted to corruptly exploit that system built on cooperation, but his misconduct is not so pernicious as to outweigh the several factors that weigh in his favor. Anger or disappointment flowing from the fact that this matter involves a lawyer who attempted to wrong the criminal justice system should not alone drive the imposition of Mr. Alfaro's sentence. It would be unfair to Mr. Alfaro and out of step with the mandate that sentencing courts must consider a full range of factors laid out in section 3553(a).

B. **History and Characteristics of the Defendant**.

Consideration of the section 3553 factors begins with the recognition that a defendant's character and history may support a downward variance and should be afforded the same weight as the nature and circumstances of the offense. *See United States v. Prosperi*, 686 F.3d 32, 39 & 45 (1st Cir. 2012) (affirming downward variance from 87-108 months to home detention because the loss numbers did not take into account the personal characteristics of the defendant); *United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008) (affirming a 91-month variance down from the guideline range based in part on "the support that the defendant stood to receive from his family [and] personal qualities indicating his potential for rehabilitation"); *United States v. Rodriguez*, 724 F. Supp. 1118, 1119 (S.D.N.Y. 1989). As one court eloquently stated with respect to this factor:

> But, surely, if ever a man is to receive credit for the good he has done, and his *immediate misconduct assessed in the context of his overall life hitherto*, it should be at the moment of his sentencing,

> when his very future hangs in the balance. This elementary
> principle of weighing the good with the bad, which is basic to all
> the great religions, moral philosophies, and systems of justice,
> was plainly part of what Congress had in mind when it directed
> courts to consider, as a necessary sentencing factor, "the history
> and characteristics of the defendant."

*United States v. Adelson*, 441 F.Supp.2d 506, 513-14 (S.D.N.Y. 2006) (emphasis added).

While Mr. Alfaro was no doubt wrong for committing the offenses, which bring him before this Court, there is much more to Mr. Alfaro than the adverse inferences to be drawn from his offense conduct. There is much positive to be stated about him which weighs in favor. Attached as composite exhibit "A" for the Court's consideration are several letters from persons who know Mr. Alfaro well.

Mr. Alfaro is the youngest of four siblings and the first in his family to be both born in the United States and attend college. He grew up under modest economic circumstances, attended public school and attended law school after working as a baggage handler for United Airlines and an investigator. His was not an easy and direct path to the law. Mr. Alfaro scrapped and fought to earn a law degree and make a career as a lawyer.

Mr. Alfaro, as attested by the letters attached as exhibit "A", is a generous and caring person. He is involved in his community. And he is an excellent and decent son, brother, father and husband.  He and his wife Britney Horstman are the parents of two special needs boys who will be very adversely impacted should they lose their father to imprisonment. While all defendants' children face adversity because of a parent's imprisonment, because of their special needs, Mr. Alfaro's boys will have it worse than

most. A defendant's family responsibilities are a recognized reason for a downward variance. *See, e.g., Prosperi 686 F.3d at 48 (*affirming substantial variance where district court found that both defendants played important roles as caregivers and caretakers in their families"); *United States  v. Muñoz–Nava*, 524 F.3d 1137 (10th Cir. 2008) (sentence of one year and a day for a man facing a guideline range of 46-57 months for possessing with intent to distribute heroin because of his long work career, community support, lack of criminal record, and responsibilities as sole supporter of 8 year-old son and elderly parents, which reduced the likelihood he would re-offend); *United States v. Davis*, 2008 WL 2329290, at *5 (S.D.N.Y. June, 5 2008) (sentence of time served for first time offender devoted to the education of six children of fifteen-year marriage and stating that incarceration would deny the children the "care and guidance clearly needed at this point in their lives").

The way in which Mr. Alfaro has faced his wrongdoing also speaks positively of his character and weighs heavily in his favor. Upon being told that his obstructive and deceitful conduct had been found out, Mr. Alfaro confessed all and agreed to cooperate. While the details of Mr. Alfaro's cooperation are not discussed in detail in this memorandum, the fact that Mr. Alfaro quickly and fully cooperated weighs heavily in his favor. *See United States v. Lozovsky*, 571 F. Supp. 2d 545, 546 (S.D.N.Y. 2008) ("Indisputably, cooperators play a vital role in the Government's law enforcement efforts. Their assistance provides the Government with a powerful means to solve crimes and thereby promote justice for the offenders, their victims and the larger society"). Several of those close to Mr. Alfaro describe how he honestly told them of his

wrongdoing and the shame and remorse he feels for what he did. His sister's words resonate:

> Nelson called us on a random day and asked us to meet with him at my mom's house, so we came together as a family. On that day my brother came to my mom's house to inform us that he is now a convicted felon, and of his admission of guilt to obstruction of justice, defrauding the United States and making false statements to federal law enforcement offers, he was a completely broken man. My sisters, my husband and I were present when he told us. He couldn't hold his head up from his embarrassment and shame. He asked our forgiveness for having done this wrong. We hugged him, cried with him and we immediately prayed for him for restoration and mercy. He spoke to us what he did and said he felt so humiliated. His remorse was evident.

Exhibit "B" (Letter of Miriam Vasquez).

In sum, while Mr. Alfaro was wrong, the totality of his life shows that he is a good and caring person who lost his way. Now that he must be judged and sentenced for his wrongdoing, Mr. Alfaro's history and characteristics weigh heavily in favor of leniency.

## C.   **Respect for the Law and Deterrence**.

These factors are intertwined and revolve around the message a sentence sends to the defendant and community to dissuade them from committing similar offenses. There are two kinds of deterrence, specific deterrence, and general deterrence.

With respect to specific deterrence, there is scant risk of recidivism in Mr. Alfaro's case. He has no meaningful criminal history and a stable family life; he is married; he has an education; he does not abuse alcohol or drugs; and he has positive personal characteristics and history, all of which indicate he is most unlikely to again

break the law. As a result of his offense, Mr. Alfaro is suffering devastating reputational harm and, having notified the Bar of his prosecution and conviction, he is being disbarred. His very early and full acceptance of responsibility and cooperation in this matter demonstrate his commitment to set the record straight and atone for his wrongdoing.

Mr. Alfaro's history or background and extremely low likelihood of recidivating may justify a downward variance or departure. *See United States v. Clay*, 483 F.3d 739, 745 (11th Cir. 2007) (affirming sentence of 60 months based on the district court's view that the defendant was unlikely to reoffend, even though the defendant's guideline range was 188-235 months); *United States v. Chase*, 560 F.3d 828, 831 (8th Cir. 2009) (Finding that lack of criminal history can be considered as a basis for downward variance even though taken into account in calculation of guideline range); *United States v. Cherry*, 487 F.3d 366, 369, 70 (6th Cir. 2007) (granting significant variance from guideline range where the defendant presented a low risk of recidivism); *United States v. Cabrera,* 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders").

The letters submitted on Mr. Alfaro's behalf provide every reason to believe that he will not re-offend, a conclusion only buttressed by his age, his lack of criminal history, and his substantial family obligations. *See United States v. Ruiz*, 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) ("This Court and others have previously declined to impose Guidelines sentences on defendants who, like Ruiz, were over the

age of forty at the time of sentencing on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants."); *United States v. Olis*, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (granting significant downward variance where the "need to provide support for his family will provide adequate deterrence against any potential future criminal conduct").

That leaves the more amorphous principle of general deterrence, a factor that many courts seem to weigh heavily. While general deterrence is important, its effect and weight are often overstated by proponents of imprisonment as a way of deterring crime, including crimes motivated by economic considerations or greed. Some courts have persuasively explained that prison sentences do not really have the general-deterrent effect assumed by the government and the proponents of lengthy prison sentences as a means of deterrence. In *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008), the D.C. Circuit explained that an overemphasis on deterrence elevates one section 3553 consideration over the others and that the effect of general deterrence can easily be overstated.  More specifically, the court reasoned:

> Moreover, the Government's argument based on deterrence alone is flawed because it elevates one § 3553(a) factor – deterrence- above all others……. In any event, we question the force of the government's deterrence argument, even when considered in isolation.  Although Gardellini may have been treated leniently, the next similarly situated tax offender cannot expect the same treatment.  Another defendant in the same situation might well receive an above-Guidelines sentence.  In light of the sentencing discretion afforded to district courts by the Supreme Court's sentencing decisions, only a fool would think that he or she would necessarily receive the same sentence as Gardellini.

16

*Id.* Here, in sentencing Mr. Alfaro, the Court should avoid over-emphasizing the need for general deterrence. It is a factor the Court must consider and weigh, but, because it is no more important than the other factors, the Court should not allow it to sway it against varying below the applicable guidelines in sentencing Mr. Alfaro.

Moreover, in assessing how severe a sentence the Court should impose upon Mr. Alfaro in order to send a deterrent message to others like him, the Court should consider the fact that it is the certainty of being caught and punished rather than the length of a sentence which best serves to deter potential offenders. *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice 1, 28 (2006) ("Three National Academy of Science Panels…. reached that conclusion, as have every major survey of the evidence."); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch, *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999). The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id.* at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates … were not sufficient to achieve statistical

17

significance." *Id.* at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1. Research regarding white-collar offenders (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburd, *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

In this matter, punishment is certain. Mr. Alfaro was caught, and he is being punished.  The Court is also confronting an unusual offense in that a lawyer was attempting to unlawfully game the cooperation system. The target audience, therefore, is other lawyers and those working in the criminal justice system. As a usually risk-averse cohort,[2] lawyers are likely to be impressed or dissuaded from similar conduct by merely learning of Mr. Alfaro's case and that the government both suspects that some may be committing similar Rule 35 fraud and that the government is investigating and prosecuting such offenses.

Moreover, unlike other common forms of white-collar offenses  where courts are concerned about the message it sends to the community at large where there are many

---

[2] *See* Henderson, M. Todd, Do Lawyers Make Better CEO's Than MBAs? Harvard Business Review, August 24, 2017, Updated October 30, 2017. (Describing study that showed that companies run by lawyer CEO's were involved in less litigation and drawing inference that it is because lawyers are more risk-averse).

persons committing the same or similar offenses, the offense conduct here is uncommon and unique in many respects, making the deterrent message less important than other more common offenses. It is not like the district courts are facing an epidemic of Rule 35 fraud cases. The *Pegg* case, which is discussed in the objections to the PSI enclosed with the Final PSI and did not involve a lawyer, would appear to be the only other case involving an attempt to procure a Rule 35 motion with the undisclosed fact that the third-party cooperator is being paid. To the extent the government suspects there are others engaged in similar conduct it can easily tighten what appear to have previously been otherwise less than exacting standards in pursuing investigations based on third-party cooperators. It probably would not take much to make it more difficult for lawyers and their clients to even consider such schemes. In fact, there is no reason or evidence to believe anything other than that the vast majority of criminal defense lawyers counsel their cooperating clients to be completely truthful and avoid any deceitful conduct when dealing with law enforcement agents and prosecutors. Imprisonment, therefore, is unnecessary to send an appropriate deterrent message.

Finally, as it relates to both specific and general deterrence, the devasting collateral consequences to Mr. Alfaro serve as a powerful deterrent to him and other lawyers who may foolishly consider similar Rule 35 schemes. Mr. Alfaro is now disbarred and has lost his law license, a very significant collateral consequence to his prosecution and conviction. Some courts have approved consideration of the collateral consequences stemming from a defendant's conviction in fashioning a reasonable sentence. *See United States v. Stewart*, 590 F.3d 93, 141 (2nd Cir. 2009) (upholding a

variance from guidelines of 78-97 months to 20 months, because the defendant's conviction for violating rules against communicating with a prisoner "[m]ade it 'doubtful that [he] could pursue' his career as an academic or translator") (reasoning that "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence"); *United States v. Pauley, 511* F.3d 468, 474 (4th Cir. 2007) (affirming a 36-month variance for a child pornography defendant, based in part on the fact that he lost his teaching certificate and state pension as a result of his conduct: "Consideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for 'just punishment' and 'adequate deterrence'"); *United States v. Wachowiak,* 496 F.3d 744 (7th Cir. 2007) (affirming 50-month variance from guidelines of 121-151 in child pornography case, in part because conviction ruined 24-year-old music student's future career as a teacher and church musician, and imposed lifelong stigma) (abrogated on other grounds); *United States v. Anderson,* 533 F.3d 623, 633 (8th Cir. 2008) (upholding a 7-month variance for a defendant convicted of insider trading and money laundering, based in part on how the defendant "suffered atypical punishment such as the loss of his reputation and his company").

Here, Mr. Alfaro will never work as lawyer again. He will never again have any clients to defend, cooperation cases, Rule 35 motions or any motions for that matter. And the lawyers out there practicing in the federal criminal justice system know it and can see what will befall them should they similarly misjudge or rationalize paying a third party-cooperator to fraudulently procure a Rule 35 motion. They risk prosecution,

a felony conviction, imprisonment *and* never again practicing law, their chosen profession. Indeed, the cadre of Rule 35 specialists who know about Mr. Alfaro's case, which was published in Law-360, are assuredly right now warning their clients against any deliberations those clients may be having to pay someone to "cooperate" for them. In short, the collateral consequences to Mr. Alfaro serve to strengthen the deterrent effect of his prosecution and *any* sentence the Court may impose.

### D. Sentencing Guidelines and Unwarranted Disparities.

According to the PSI, the applicable guideline range calls for a term of imprisonment of 27-33 months based on a total adjusted offense level 18 with a category I criminal history. *See* Final PSI, ¶ 105. Mr. Alfaro objected to two of the three enhancements set forth in the PSI. Our view is that that the total offense level should be 13, rendering a range of 12-18 months. The Sentencing Guidelines, however, are but one of the considerations that the Court must consider in fashioning a fair and reasonable sentence. *See Hunt*, 459 F.3d at 1184 (11th Cir. 2016) ("If *Booker* is to mean anything, it must be that district courts are obligated to impose a reasonable sentence, regardless of the guideline range, so long as the Guidelines have been considered"). Nor should the applicable sentencing guidelines be presumed reasonable by a sentencing court. *Nelson*, 555 U.S. at 532. As recognized by the Eleventh Circuit in *United States v. Glover*, 431 F.3d 744, 752-753 (11th Cir. 2005), in some cases the guidelines may have little persuasive force in light of some of the other § 3553(a) factors.

In the instant case, as advocated throughout this memorandum, we do not believe that a sentence of imprisonment is necessary to satisfy the factors set forth in 18 U.S.C. § 3553(a). While there are few, if any cases, with which to compare this case, it nevertheless appears that Mr. Alfaro is being treated more harshly than other members of the criminal justice system who lost their way. Attached as exhibit "B" is the government's press release in connection with its case against former DEA agents Samuel Murad and Robert Quinn. The press release shows that Mr. Quinn's relevant conduct included that on November 23, 2020 he lied to the FBI while he was still an agent.

The government, however, allowed Mr. Quinn to plead guilty to a false statement offense stemming from a lie he told *after* he retired from DEA. *See* Criminal Judgment attached exhibit "C" (showing date of false statement offense as May 17, 2014). By doing so, it sparred Mr. Quinn a 2-level increase in his guidelines under USSG § 3B1.3 which is based on special skill or abuse of trust. Since the government and the sentencing court agreed that the guideline turned on the offense of conviction rather than relevant conduct, the section 3B1.3 guideline based on abuse of trust was not applied to Mr. Quinn. Attached composite exhibit "D" are the relevant except from Robert Quin's sentencing transcript. While that may have been fair to Mr. Quinn it seems unfair to Mr. Alfaro who sees himself facing every guideline enhancement the government deems available. It appears that he been a career DEA agent rather than a criminal defense attorney he would be treated differently. Therefore, in fashioning Mr. Alfaro's sentence, the Court should consider that the government is not treating him as

22

generously as it treated Mr. Quinn, a former government agent.

## CONCLUSION

In conclusion, Mr. Alfaro respectfully requests that the Court sustain his objections to the PSI and vary below the applicable guideline range in sentencing him. He respectfully requests that the Court not imprison him. Mr. Alfaro has no prior convictions. He has very positive character traits. He is the father of two special needs children. He quickly and fully cooperated.  He has been disbarred and will never again practice law.  He is most unlikely to recidivate. Imprisoning Mr. Alfaro is unnecessary to send a strong deterrent message to lawyers and others in the criminal justice system. And the fact that he was a criminal defense attorney, who tried to wrong the criminal justice system, should not obscure his otherwise positive character and history. There is much more to Nelson Alfaro than his wrongdoing in this case. Simply put, he does not belong in prison. In fact, the following excerpt from Francois Illas' letter (*see* exhibit A) to the Court concisely and in plain lay-terms explains why Mr. Alfaro need not be imprisoned:

> Nelson's crimes are of a serious nature, but it is my belief the sum of his life and the good person he has been does not justify imprisonment for these crimes. This would neither serve the public good or Nelson since I do believe with the continued support of his family and friends someday Nelson will be able to pay his debt to society in such a way that will further benefit the public than having him serve a prison sentence.

Exhibit "B" (Letter of Francois Illas).

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on March 9, 2020 a true and correct copy of the foregoing was filed and served via CMECF on Assistant United States Attorney Josie Thomas.

Respectfully submitted,

**BELL ROSQUETE REYES ESTEBAN, PLLC.**
999 Ponce De Leon Blvd.
Suite 1120 - Penthouse
Coral Gables, Florida 33134
Telephone:    (305) 570-1610
Direct Line:  (305) 570-1576
Cellular:        (305) 781-8111
Facsimile:     (305) 570-1599
Email:          hbell@brresq.com

By:_____ s/ henry p. bell
     HENRY P. BELL
     Fla. Bar No. 0090689